**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

SCHLUMBERGER TECHNOLOGY CORPORATION, §
§
  *Plaintiff*, §
§
v. § CIVIL ACTION H-17-3211
§
BICO DRILLING TOOLS, INC., §
§
  *Defendant*. §

**MEMORANDUM OPINION AND ORDER**

Pending before the court is a motion for summary judgment filed by defendant BICO Drilling Tools, Inc. ("BICO"). Dkt. 53. After considering the motion, response, reply, and applicable law, the court is of the opinion that the motion should be DENIED.

**I. BACKGROUND**

This case revolves around U.S. Patent No. 6,604,921 (the '921 Patent), which is entitled "Optimized Liner Thickness for Positive Displacement Drilling Motors." Plaintiff Schlumberger Technology Corporation ("Schlumberger") filed the '921 Patent on January 24, 2002, and it obtained the patent on August 12, 2003. Dkt. 1 & Ex. A. Schlumberger contends that BICO infringed the '921 Patent by "importing, making, using, offering to sell, and/or selling products . . . that embody the patented invention, including . . . stators, motors, and power sections," which BICO asserts are manufactured by Wilhelm Kächele Gmbh ("Kächele"), a German company. *See* Dkts. 1 (complaint), 53 (motion to dismiss). BICO contends that the accused products were designed in 1998, purchased by BICO as part of a manufacturing and distribution agreement with Kächele over a year before Schlumberger filed its patent application, and displayed by Kächele at trade shows in the United States over a year before Schlumberger filed its patent application. Dkt. 53. BICO argues that these

pre-application activities invalidate the '921 Patent under 35 U.S.C. § 102(b), which provides that inventions that are "in public use or on sale in this country more than one year prior to the date of the application for patent" are invalid. *Id.* BICO accordingly moves for summary judgment in its favor. *Id.*

## A. The '921 Patent

The abstract of the '921 Patent states that the invention is a "stator for a positive displacement motor including an external tube" and that the "external tube includes an outer surface and an inner surface, and the inner surface includes at least two radially inwardly projecting lobes extending helically along a length of the external tube." Dkt. 53, Ex. A, Ex. 1. The liner of the tube has a "thickness . . . at a maximum at the at least two radially inwardly projecting lobes." *Id.*

There are four named figures in the '921 Patent, three represent prior art and the fourth represents one embodiment of the claimed invention. *Id.* In the embodiment of the invention, Figure 4, the liner is thicker at the inwardly projecting lobes.[1] *See id.*



**FIG. 4**

Schlumberger contends that BICO has infringed one or more claims of the '921 Patent, including but not limited to Claims 1 and 8. Dkt. 1. Claim 1 of the '921 Patent states:

---

[1] In Figure 4, the number 40 denotes the lobes, and the number 42 shows the thickness of the liner.

2

> A stator for a positive displacement motor comprising: an external tube comprising an outer surface and an inner surface, the inner surface comprising at least two radially inwardly projecting lobes extending helically along a selected length of the external tube; and a liner disposed proximate the inner surface, the liner conforming to the radially inwardly projecting lobes formed on the inner surface and to the helical shape of the inner surface, wherein a thickness of the liner is at a maximum proximate the at least two radially inwardly projecting lobes.

Dkt. 53, Ex. A, Ex. 1.

Claim 8 similarly states:

> A positive displacement motor comprising: a stator comprising an external tube and an inner surface, the inner surface comprising at least two radially inwardly projecting lobes extending helically along a selected length of the external tube, and a liner disposed proximate the inner surface, the liner conforming to the radially inwardly projecting lobes formed on the inner surface and to the helical shape of the inner surface, wherein a thickness of the liner is at a maximum proximate the at least two radially inwardly projecting lobes . . . .

*Id.*

## B.     BICO's Contracts with Kachele

BICO contends that Kachele developed its "Even Wall" technology in 1995. *Id.* This technology allegedly shapes the stator and reduces the liner thickness for a more efficient stator. *Id.* According to Kachele's inventor Bruno Kachële ("B. Kachele"), he presented the Even Wall technology at the Offshore Technology Conference ("OTC") in Houston, Texas, in 1998. Dkt. 53, Ex. A ¶ 5. B. Kachele specifically recalls presenting the technology to BICO's CEO, Heino Rohde, during the 1998 tradeshow. *Id.*

In September 1998, Kachele and BICO entered into a Cooperation Agreement in which Kachele would "ensure that the demand BICO has for stators and rotors, Even Wall products®, can be covered by adequate production capacities at KACHELE on time . . . ." Dkt. 53, Ex. A, Ex. 12.

BICO was to order "part of its own demand for stators and rotors" from Kachele, "[f]ollowing completion of successful test runs in the drilling field." *Id.* BICO also agreed to "take over global distribution of motor sections to third-party motor manufacturers." *Id.* According to B. Kachele, the stators were identified as "even wall" "despite the fact that there were still minor variations in liner thickness including having a maximum thickness at the stator lobes." *Id.* ¶ 17.

BICO contends that it received commercial offers from Kachele for its Even Wall stators combined with a rotor, including (1) a price quote for its Even Wall stators with corresponding rotors in various sizes including 3 3/4 and 6 3/4 with liners thicker at the lobes on July 2, 1999; and (2) a 1999 price list with pricing information for composite rotors, including 3 3/4 and 6 3/4 rotors shown in engineering drawings. BICO asserts that it ordered in 1999 and received in early 2000 two rechromed 6 3/4 rotors. *Id.* (citing Dkt. 53, Ex. A & Ex. A, Ex. 21). Additionally, it contends that it placed and received orders for 3 3/4 Even Wall stators throughout 2000 and early 2001. *Id.* (citing Dkt. 53, Ex. A & Ex. A, Exs. 22–23, 29, 30–31). BICO argues that the delivered stators included shaped tubes with non-uniform liners having a maximum thickness at the stator lobe of 7.6 mm and a minimum thickness of 5.7 mm. *Id.* It also placed orders for five 2 7/8 Even Wall stators, which were delivered in January 2001. *Id.* (citing Dt. 53, Ex. A & Exs. 24–26, 30–31). These stators also had liners that were thicker at the lobes. *Id.* (citing Dkt. 53, Ex. A, Exs. 24–26 (invoices), Exs. 30–31 (sales summaries), Exs. 27–28 (drawings)).

Schlumberger argues that the products BICO received under the cooperation agreement do not trigger the "on sale" bar that must be met to invalidate a patent under 35 U.S.C. § 102(b) (2002).[2]

---

[2] The court refers throughout this memorandum opinion and order to the sections of Title 35 that were in effect before Congress enacted the Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011), as the parties agree the prior version applies here. *Cf. Barry v. Medtronic, Inc.*, 914 F.3d 1310, 1319 n.1 (Fed. Cir. 2019).

Dkt. 57. Specifically, Schlumberger asserts that there is a difference between products sold commercially and those put to experimental use. *Id.* It contends that any sales between Kachele and BICO were confidential sales by BICO's contract manufacturer for experimental use and that Kachele did not have the right to market or commercialize the stators. *Id.* It also argues that the double tube stator designs in some of the exhibits do not fall within the scope of the patent and that some of the invoices do not match the drawings. *Id.*

BICO argues that the case on which Schlumberger relies regarding experimental use relates only to cases in which neither the title to the embodiments nor the right to market passed to the buyer, and that in this case Kachele did not invoice manufacturing services, it sold the actual product to BICO. Dkt. 59. BICO also asserts that Schlumberger fails to address a recent Supreme Court decision that confirms that alleged "secret sales" may invalidate a patent. *Id.* (citing *Helsinn Healthcare S.A. v. Teva Pharms.*, 139 S. Ct. 628 (2019)).

## C. Alleged Public Display of Stators and Rotors

In addition to the patent being invalid due to the invention being on sale more than a year before filing, BICO asserts that Kachele marketed and publically displayed its Even Wall motors to the industry at OTC in 1999 and 2000, which was over a year before the patent was filed and invalidates the patent under the public use bar. Dkt. 53. For the 1999 OTC, Kachele ran an advertisement in the *Oil and Gas Journal* announcing the launch of the Even Wall power sections, which included stators and rotors for mud motors. *Id.* (citing Dkt. 53, Ex. A & Ex. A, Ex. 8). It also had a similar advertisement in *Offshore* in May 1999 (citing Dkt. 53, Ex. A & Ex. A, Ex. 32). The advertisements do not discuss liner thickness. *See* Dkt. 53, Ex. A, Exs. 8. 32.

BICO asserts that Kachele displayed a physical example of the Even Wall design as well as drawings at the OTCs. *Id.* The drawings included cross-sectional views that showed the stator liner

5

for the 3 3/4 Even Wall stator had a maximum thickness of 8 mm at the lobes and a mimimum thickness of 6 mm, and the liner for the 6 3/4 stator had a maximum thickness of 12 mm at the stator lobes and a minimum thickness of 8.4 mm. *Id.* BICO contends that Vernon Koval, who is one of the named inventors for the Schlumberger patent, visited the Kachele booth at the 1999 OTC. *Id.* (citing Dkt. 53, Ex. A ¶¶ 39–42, Ex. A, Exs. 40–42). In fact, Schlumberger requested information from Kachele following the OTC about the availability of Even Wall mud motors for in-house testing at Sclumberger. *Id.* (citing Dkt. 53, Ex. A ¶¶ 45, 48 & Ex. A, Exs. 45, 48).

Kachele again displayed its Even Wall power sections at OTC in May 2000. *Id.* (citing Dkt. 53, Ex. A ¶ 43, Ex. A, Ex. 43). The folder of items it displayed included drawings of the 2 7/8, 3 3/4, and 6 3/4 Even Wall stators and rotors, including the cross-sectional drawings that had maximum thickness at the lobes. *Id.* (citing Dkt. 53, Ex. A ¶¶ 43, 44 & Ex. A, Ex. 44 at 455559-65).

Sclumberger argues that the displays at the OTCs were not invalidating public uses because the claimed invention was not actually *used* in public. Dkt. 57. The drawings similarly could not be "used" as a stator or motor. *Id.* Schlumberger additionally points out that B. Kachele testified that the single tube stators in the 1999 drawings were never commercialized. *Id.* Additionally, it contends that B. Kachele testified that Kachele would not have displayed products it could not make and deliver, which Schlumberger contends presents an issue of material fact as to whether the "dummy stator" was displayed at OTC in 1999. *Id.* Sclumberger contends that mere preparations for sales, like the displays or drawings at OTC, do not trigger 35 U.S.C. § 102(b). *Id.* (citing *Medicines Co. v. Hospira Inc.*, 827 F.3d 1363, 1373 (Fed. Cir. 2016), (en banc)).

The motion for summary judgment is now ripe for disposition. The court will first set forth the legal standard for motions for summary judgment and then will discuss whether there is

sufficient evidence of invalidity to grant summary judgment in BICO's favor or whether there is an issue of material fact precluding summary judgment.

## II. LEGAL STANDARD

A court shall grant summary judgment when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] fact is genuinely in dispute only if a reasonable jury could return a verdict for the nonmoving party." *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986). If the moving party meets its burden, the burden shifts to the non-moving party to set forth specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(e). The court must view the evidence in the light most favorable to the non-movant and draw all justifiable inferences in favor of the non-movant. *Envtl. Conservation Org. v. City of Dallas*, 529 F.3d 519, 524 (5th Cir. 2008).

A patent is presumed valid, and its validity can only be overcome by clear and convincing evidence. *SRAM Corp. v. AD-II Eng'g*, 465 F.3d 1351, 1357 (Fed. Cir. 2006). "[A] moving party seeking to invalidate a patent at summary judgment must submit such clear and convincing evidence of facts underlying invalidity that no reasonable jury could find otherwise." *Id.*

## III. ANALYSIS

"[T]he patent system represents a carefully crafted bargain that encourages both the creation and the public disclosure of new and useful advances in technology, in return for an exclusive monopoly for a limited period of time." *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 63, 119 S. Ct. 304 (1998). "Consistent with these ends, § 102 of the Patent Act serves as a limiting provision, both excluding ideas that are in the public domain from patent protection and confining the duration of

the monopoly to the statutory term." *Id.* at 64. Under 35 U.S.C. § 102(b) (prior to amendments in 2011), a person is not entitled to a patent if "the invention was patented or described in a printed publication in this or a foreign country or in public use or sale in this country, more than one year prior to the date of the application for patent in the United States," which courts often refer to as the "critical date."

The "public use" provision includes "'any use of [the claimed] invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor.'" *Petrolite Corp. v. Baker Hughes, Inc.*, 96 F.3d 1423, 1425 (Fed. Cir. 1996). "Consideration of public use includes analysis of, *inter alia*, the nature of and public access to activities involving the invention; confidentiality obligations imposed upon observers; commercial exploitation; and the circumstances surrounding testing and experimentation." *Am. Seating Co. v. USSC Grp., Inc.*, 514 F.3d 1262, 1267 (Fed. Cir. 2008). "In order for a use to be public within the meaning of § 102(b), there must be a public use with all of the claim limitations." *Clock Spring, L.P. v. Wrapmaster, Inc.*, 560 F.3d 1317, 1325 (Fed. Cir. 2009).

The "on-sale" provision "is directed at precluding an inventor from commercializing his invention for over a year before he files his application. Sales or offers made by others and disclosing the claimed invention implicate the 'public use' provision of 35 U.S.C. § 102(b)." *In re Caveney*, 761 F.2d 671, 675 n.5 (Fed. Cir. 1985); *see ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 866 (Fed. Cir. 2010) (reiterating this same language from *Caveney*). The on-sale bar does not preclude an inventor from testing his or her experiment more than a year prior to filing for a patent, but "'[a]ny attempt to use it for a profit, and not by way of experiment, for a longer period . . . before the application, would deprive the inventor of his [or her] right to a patent.'" *Pfaff*, 525 U.S. at 65 (quoting *Elizabeth v. Am. Nicholson Pavement Co.*, 97 U.S. 126, 137 (1877)). "[T]he on-sale bar

applies when two conditions are satisfied before the critical date. First, the product must be the subject of a commercial offer for sale. . . . Second, the invention must be ready for patenting." *Id.* at 67. "A commercial sale 'is a contract between parties to give and to pass rights of property for consideration which the buyer pays or promises to pay the seller for the thing bought or sold.'" *The Medicines Co. v. Hospira, Inc.*, 881 F.3d 1347, 1351 (Fed. Cir. 2018) (quoting *Grp. One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1047 (Fed. Cir. 2001)). "An offer for sale is 'one which the other party could make into a binding contract by simple acceptance.'" *Id.* (quoting *Grp. One*, 254 F.3d at 1048). "Ready for patenting" means either "proof of reduction to practice before the critical date," or "proof that prior to the critical date the inventor had drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." *Pfaff*, 525 U.S. at 67–68.

The court must determine whether the sales and display of Kachele's motors prior to the critical date constitute public use or meet the on-sale bar. The critical date is July 24, 2001, which is one year before Schlumberger filed the '921 Patent. Dkt. 53.

### A.    On Sale Bar

BICO contends that Kachele triggered the on-sale bar through its supply agreement with BICO and its initial development of Even Wall stators and motors prior to the critical date. Dkt. 53. According to BICO, the agreement imposed obligations on Kachele to supply the Even Wall stators and rotors, which was a complete commercial offer for sale. *Id.* Kachele agreed to supply the stators and rotors and to supply BICO with its demand as Kachele's exclusive global distributor. *Id.* BICO contends the offer to sell became binding when Kachele provided BICO with a price list for three models of Even Wall rotors and stators in July 1999. *Id.* BICO asserts that each sale of the stators, starting in 1999 and continuing until the critical date, triggered the on-sale bar, and that Kachele

built, delivered, and invoiced for different sizes of Even Wall stators and at least one rotor starting in 1999 through the critical date. *Id.* BICO provides invoices as evidence that the stators and rotors were "on sale" before the critical date. *Id.* BICO contends that even though the products were sold to BICO as a distributor rather than to the public at large, the sales still trigger the on-sale bar. *Id.* It additionally argues that the motors were "ready for patenting" by 1999 when Kachele created the drawings of different sizes that it sent with the price quotes. *Id.*

Schlumberger argues that (1) these sales were confidential sales between third parties for experimental use and thus do not invalidate the '921 Patent; (2) the agreement is for "even wall" stators and motors, not stators and motors with uneven wall liners like the '921 Patent; and (3) only BICO had the right to market or commercialize the stators under the agreement, and it provides no evidence that it did so. Dkt. 57. It also asserts that the on-sale bar applies only to sales by the inventor of the patented product, and that sales by third parties implicate the "public use" provision, not the "on-sale" bar. *Id. Id.* Finally, it takes issue with some of the invoices, arguing that they are for products that failed testing and could not have been commercialized, do not match drawings, or are for double ring stators or for rotors that do not fall within the scope of the patent. *Id.* It points out that the USPTO found that double tube stators do not fall within the scope of the patent. *Id.* (citing Ex. 87 at 4, Supp. Exam; Ex. 56, Fig. 2). The court will first review the terms of the contract with regard to sales from Kachele to BICO. It will then address the most significant case law that the parties contend supports their positions and consider how it applies to the facts of this case.

### 1.    The Contract

Under the agreement, Kachele was to "ensure that the demand BICO has for stators and rotors, Even Wall products, can be covered with adequate production capacities." Dkt. 53, Ex. 12. After successful test runs, Bico was to "order part of its own demand for stators and rotors from

Kachele." *Id.* BICO was also to "take over global distribution of motor sections to third-party motor manufacturers, including BICO's motor programme as well as motors which customers have made inquiries for and motor types designed by BICO and ordered by BICO from Kachele." *Id.* BICO had "exclusive global distribution rights for the mud motors of the Kachele Even Wall technology." *Id.* Both parties agreed to not disclose any information "which the other party considers worthy of protection and explicitly communicates as such to the other Party to the Agreement." *Id.*

### 2. *ResQNet.com* and *In re Caveney*

BICO contends that Kachele's sales to BICO implicate the on-sale bar, but in *In re Caveney* in 1985, the Federal Circuit stated in a footnote that sales "made by others and disclosing the claimed invention implicate the 'public use' provision," not the "on-sale" bar, noting that the on-sale provision "is directed at precluding an *inventor* from commercializing his [or her] invention for over a year before he [or she] files his [or her] application." 761 F.2d at 675 n.5 (emphasis added).

Twenty-five years later, the Federal Circuit reiterated this concept in *ResQNet.com.* 594 F.3d at 866. In *ResQNet.com*, the defendant, Lansa, Inc., had advertised for sale a year before the patent at issue an early version of the product that allegedly infringed the plaintiff ResQNet.com's patent. Lansa argued that the advertisement was an offer for sale, sale, or public use over a year before patenting that barred patenting under § 102(b). 594 F.3d at 866. The Federal Circuit, citing *In re Caveney*, noted that such a sale, "even if the sale was not authorized by the patentee," will bar patenting of the product, as "'sales or offers made by others and disclosing the claimed invention implicate the "public use" provision.'" *Id.* (quoting *In re Caveney*). The court, however, affirmed the district court's finding that the advertised version did not embody all of the elements of the patented product, and therefore could not constitute prior art. *Id.* at 867.

In 2013, a federal district court in the Central District of California, relying on *ResQNet.com*, found that a third party's use of a patented system did not implicate the on-sale bar as a matter of law because the third party was not the patentee. *Medtronic v. Edwards Lifesciences Cor.*, No. SACV 12-00327-JVS (MLGx), 2013 WL 12113417, at *21–22 (C.D. Cal. Sept. 17, 2013). The *Medtronic* court pointed out that while a sale by a third party will bar patenting, it must be a sale of the patented invention itself, and sales by others that simply disclose the claimed invention "'implicate the 'public use' provision.'" *Id.* (quoting *ResQNet.com*, 594 F.3d at 866); *see also Sunoco Partners Mktg. & Terminals L.P. v. U.S. Venture, Inc.*, 339 F. Supp. 3d 803, 839 (N.D. Ill. 2018) (reasoning that the on-sale bar did not apply "because the offers were made by someone other than the patentee, and there [was] no evidence that these offers publicly disclosed the invention" (relying on *ResQNet.com* and *Medtronic*)). It explained that the "'on sale' provision . . . is directed at precluding *an inventor* from commercializing his invention for over a year before he files his application.'" *Id.* (quoting *In re Caveney*, 761 F.2d at 675).

These cases indicate that the court should not be concerned with the on-sale bar analysis and instead should determine whether Kachele and BICO's activities constitute public use. BICO, however, argues that more recent cases applying the on-sale bare are applicable here, and Schlumberger also relies on some of these cases. The court will therefore address these cases and determine whether they impact the Federal Circuit's guidance in *ResQNet.com*, which would restrict the analysis in this case to the public use provision.

### 3. *Medicines and Helsinn Healthcare*

Both parties rely on *Medicines Co. v. Hospira*, though Schlumberger relies on an en banc decision from the Federal Circuit, which resolves one aspect of the case, and BICO relies on a regular panel decision of the Federal Circuit that considered issues that the en banc court remanded.

The court will first discuss the en banc opinion and then turn to the aspect of the case that was remanded.

Schlumberger relies on *Medicines Co. v. Hospira, Inc.*, 827 F.3d 1363 (Fed. Cir. 2016) (en banc), to argue that "preparations for commercial sales, like defendant's/Kachele's activities, do not trigger the § 102(b) provisions." Dkt. 57. In *Medicines*, an en banc Federal Circuit held that "to be 'on sale' under § 102(b), a product must be the subject of a commercial sale or offer for sale, and that a commercial sale is a sale that bears the general hallmarks of a sale pursuant to Section 2-106 of the Uniform Commercial Code." 827 F.3d at 1365.

MedCo, a pharmaceutical company that does not manufacture its own products, contracted with Ben Venue Laboratories to manufacture a drug, and the companies ended up developing a new compounding process for this drug after there were issues with the original batches of drugs provided. *Id.* at 1366. MedCo patented this product and product-by-process, filing applications on July 27, 2008. *Id.* at 1367. The critical date, then, was July 27, 2007. *Id.* MedCo paid Ben Venue to manufacture three batches of the drug using this process in late 2006. *Id.* The manufacturing protocol under which MedCo and Ben Venue were working required the solution be filled for commercial use, but the batches would be placed on hold until all testing was complete. *Id.* The three batches were placed in quarantine with MedCo's distributor, Integrated Commercialization Solutions ("ICS"), pending Federal Food and Drug Administration ("FDA") approval. *Id.* MedCo and ICS had a distribution agreement, effective on February 27, 2007 (prior to the critical date), whereby ICS was the exclusive distributor of the quarantined drug in the United States. *Id.* MedCo, however, did not release the drugs from quarantine until August 2007, which was *after* the critical date. *Id.*

In the mean time, the defendant in *Medicines*, Hospira, Inc., filed two Abbreviated New Drug Applications with the FDA to sell generic versions of the drug product that MedCo patented. *Id.* at 1365. MedCo sued Hospira for infringement, and Hospira alleged invalidity under § 102(b) because MedCo paid Ben Venue to manufacture the product before the critical date and MedCo offered to sell the product to ICS—its distributor—before the critical date. *Id.* at 1368. MedCo argued that the contract with Ben Venue was for manufacturing services and that the title to the drug always remained with MedCo. *Id.* The en banc Federal Circuit held that "the mere sale of manufacturing services by a contract manufacturer to an inventor to create embodiments of a patented product for the inventor does not constitute a 'commercial sale' of the invention." *Id.* at 1373. It concluded that the contract between MedCo and Ben Venue was not a commercial sale because "(1) only manufacturing services were sold to the inventor; (2) the inventor maintained control of the invention, as shown by the retention of title to the embodiments and the absence of any authorization to Ben Venue to sell the product to others; and (3) 'stockpiling,' standing alone, does not trigger the on-sale bar." *Id.*

As to the first point, the court found that Ben Venue was not free to use or sell the claimed products or to deliver them to anyone other than MedCo. The court found that the absence of the passage of title was "significant because, in most instances, that fact indicates an absence of commercial marketing of the product by the inventor." *Id.* a 1376. The court declined to draw a bright line, noting that there are instances where a invention could be considered "on sale" for a price when title does not transfer. *Id.* The court noted that the "confidential nature of the transactions is a factor, [like transfer of title,] which weighs against the conclusion that the transactions were commercial in nature," even though there are instances in which the Federal Circuit agrees that confidential sales are still commercial. *Id.* Rather than relying on any specific factor, the court

instructed that the focus should be on "what makes [the] on-sale bar jurisprudence coherent: preventing inventors from filing for patents a year or more after the invention has been commercially marketed, whether marketed by the inventor himself or a third party." *Id.*

Here, Sclumberger argues that *Medicines* is dispositive because the activities of BICO and Kachele, which it characterizes as BICO's manufacturer or supplier, were preparations for commercial sales, not actual commercial offers or sales, and thus do not trigger the "on sale" bar. Dkt. 57. BICO distinguishes *Medicines* because in *Medicines* the manufacturer sold manufacturing services, not the actual product, so the title did not change hands. Here, on the other hand, Kachele owned the products and, according to BICO, sold them to BICO as its distributor, and title of the product changed hands. Dkt. 59. Neither party addresses that in *Medicines* the "sale" was of the patented product itself and involved the patented product, not a third party's product that discloses the claimed invention, which, under *ResQNet.com* and *In re Caveney*, should be analyzed under the public use provision, not the on sale provision.

BICO relies primarily on *Medicines Co. v. Hospira, Inc. (Medicines II)*, 881 F.3d 1347 (Fed. Cir. 2018), and *Helsinn Healthcare S.A.* for its on sale provision argument. *Id. Medicines II* is the original Federal Circuit panel's determination, after the en banc court remanded the case to the original panel, regarding whether the distribution agreement between MedCo and ICS triggered the on-sale bar. *See Medicines*, 827 F.3d at 1381 (remanding this and another issue to the original panel). Under the MedCo and ICS distribution agreement, title of the product passed to ICS, and MedCo was unable to sell the product to any other parties in the United States during the term of the contract. *Medicines II*, 881 F.3d at 1349. ICS was required to place weekly orders for the quantities it needed, and MedCo was required to use commercially reasonable efforts to fill the orders. *Id.* Hospira (the generic drug company) asserted in the lower court that MedCo's patents were invalid,

and the district court, after a bench trial, determined the patents were neither infringed nor invalid. *Id.* at 1350. The district court found that the distribution agreement was not an offer to sale the drug. *Id.*

The *Medicines II* panel found that under the standards established in *Medicines*, "the terms of the Distribution Agreement make clear that the Medicines Company and ICS entered into an agreement to sell and purchase the product." *Id.* at 1351. It found it relevant that the contract stated that MedCo desired to sell the product and that ICS desired to purchase and distribute the product. *Id.* MedCo had argued that, regardless, under the agreement it had the option of rejecting all purchase orders submitted by ICS. *Id.* The panel found this argument unpersuasive because (1) MedCo agreed to sell the product and ICS agreed to purchase it, passing title of the product, and the "passage of title here 'is a helpful indicator' that [the drug] was subject to an offer for sale" under the UCC; and (2) the agreement required MedCo to use "commercially reasonable efforts" to fill the orders, so MedCo did not really have a blanket ability to reject orders. *Id.*

The court specifically noted that there were "stark differences" between the agreement between MedCo and ICS being considered in *Medicines II* and the agreement between MedCo and Ben Venue considered in *Medicines*. *Id.* at 1352. Specifically, the contract with Ben Venue was for manufacturing of the product, and title of the product did not transfer. *Id.* at 1353. In *Medicines*, Ben Venue was selling manufacturing services, not the product, and it only charged a small percentage of the market value of the product. In *Medicines II*, MedCo was selling *the product* for a commercial price. *Id.* The panel found that "the on-sale bar does not exempt commercial agreements between a patentee and its supplier or distributor," and it affirmed this aspect of the district court's decision. *Id.* The panel remanded the case to the district court because the district court had never determined whether the offer to sell covered the patented invention. *Id.*

Here, *Medicines II* is more on point than *Medicines*, as the relationship between Kachele and

BICO is more like the relationship between MedCo and ICS than the relationship between MedCo

and Ben Venue. However, the major distinction is that MedCo is the patent owner in the *Medicines*

cases. Neither BICO nor Kachele are the patentee. BICO is a third party that purchased a product

from Kachele that allegedly discloses the claimed invention. The *Medicines* cases do not discuss

whether or how sales that have no relation to the patentee should be analyzed.

BICO also relies on *Helsinn Healthcare*, arguing that under *Helsinn Healthcare*, confidential

secret sales may still invalidate a patent. Dkt. 59 at 2. In *Helsinn*, the U.S. Supreme Court

considered whether "the sale of an invention to a third party who is contractually obligated to keep

the invention confidential places the invention 'on sale' within the meaning of [the current version

of] § 102(a)," which is similar to the previous version of § 102(b). *Helsinn Healthcare*, 139 S. Ct.

at 630. A Swiss pharmaceutical company contracted with a company that markets and distributes

drugs in the United States to distribute, promote, market, and sell its drug in the United States two

years before it filed a provisional patent application for the drug. 139 S. Ct. at 631. The United

States company was required to keep the invention confidential, though the sale between the Swiss

and U.S. companies was publically disclosed. *Id.* The Court pointed out that it did not require under

the earlier version of the statute that the "sale make the details of the invention available to the

public," and the use of the phrase "on sale" in the amended statute similarly did not require that the

public be aware. *Id.* It noted that its "precedents suggest that a sale or offer of sale need not make

an invention available to the public," and the Federal Circuit had "long held that 'secret sales' can

invalidate a patent." *Id.* at 633. These were, of course, the patentee's secret sales. *See id.* (citing

*Special Devices, Inc. v. OEA, Inc.*, 270 F.3d 1353, 1357 (Fed. Cir. 2001) (finding that "sales for the

purposes of commercial stockpiling of an invention, even if they took place in secret," were

17

invalidating sales under the on-sale bar), and *Woodland Tr. v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1370 (1998) (holding that "an inventor's own prior commercial use, albeit kept secret, may constitute a public use or sale under § 102(b), barring him from obtaining a patent")).

*Helsinn*, like *Medicines*, deals with the on-sale bar and sales of the patented invention more than a year prior to the patent date, which benefitted the inventor, not sales of a product that discloses the invention by a third party. Neither case changed the Federal Circuit's guidance from *ResQNet.com* and *In re Caveney* that the sales in cases like the instant case should be analyzed under the public use prong. Applying the on-sale bar in this case would not further the policy of preventing "an inventor from profiting from the commercial use of an invention for a prolonged period before filing a patent application claiming that invention." *See Medicines*, 827 F.3d at 1372 (listing all of the policies underlying § 102(b)). The court therefore turns to the public use provision.

**B.  Public Use**

The court will consider two of BICO's arguments under the public use provision: (1) BICO's argument that the invention was "on sale" prior to the critical date under the public use provision; and (2) BICO's argument that Kachele put the invention into public use when it displayed its Even Wall motors at the OTC in 1999 and 2000. *See* Dkt. 53. With regard to the sales, Schlumberger contends these were confidential non-commercial sales and even if they were commercialized prior to the critical date, none invalidates the patent because the items sold either are not the same design or there are problems with the evidence. Dkt. 57. As far as the display or displays at OTC, Sclumberger contends that evidence of displaying a "dummy" stator is not clear and convincing evidence of public use. *Id.*

Under the public use provision, a patent is invalid if the invention was "in public use . . . in this country . . . more than one year prior to the date of the application for patent." § 102. "Public

use includes 'any use of [the claimed] invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor.'" *Petrolite Corp.*, 96 F.3d at 1425 (quoting *In re Smith*, 714 F.2d 1127, 1134 (Fed. Cir. 1983)). Whether a patent is invalid due to public use is a question of law based on the underlying facts. *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1378 (Fed. Cir. 2005). The bar applies only if the invention is both in public use and ready for patenting. *Id.* at 1379.

For public use, the court must consider whether the purported use "(1) was accessible to the public; or (2) was commercially exploited." *Id.* at 1380. "[E]vidence of experimental use may negate either the 'ready for patenting' or 'public use' prong." *Id.* at 1379–80; *see Barry v. Medtronic, Inc.*, 914 F.3d 1310, 1321 (Fed. Cir. 2019) (noting that proof "'of experimental use serves as a negation of the statutory bars'" (quoting *Polara Eng'g Inc. v. Campbell Co.*, 894 F.3d 1339, 1348 (Fed. Cir. 2018)). "Thus, the test for the public use prong includes the consideration of evidence relevant to experimentation, as well as, *inter alia*, the nature of the activity that occurred in public; public access to the use; confidentiality obligations imposed on members of the public who observed the use; and commercial exploitation." *Invitrogen*, 424 F.3d at 1380. The "ready for patenting" prong requires "(a) a reduction to practice or (b) drawings or descriptions enabling an ordinarily skilled artisan to practice the invention." *Barry*, 914 F.3d at 1322 (citing *Pfaff*, 525 U.S. at 67–68).

The court will first consider whether Kachele's sales to BICO constitute public use, and then it will turn to the displays at OTC.

### 1. Do Kachele's Sales to BICO Constitute Public Use?

BICO argues that the '921 Patent is invalid because Kachele's sales to BICO under their agreement constitute a "commercial offer for sale." Dkt. 53 at 10. Sclumberger argues that the

product was not subject to a "commercial offer for sale" before the critical date because there is no evidence that BICO (the U.S. distributor) commercialized any of the products, and that, regardless, secret or confidential uses by third parties do not invalidate later filed patents under the public use provision, which is the applicable provision when considering third-party sales. Dkt. 57 at 3–4, 8. It also argues that the sales were for manufacturing services or solely for experimental use and that, regardless, the products in the invoices do not practice the claims of the '921 Patent.

### a. Distribution Agreement

BICO cites the *Medicines* cases for the proposition that sales between a supplier and distributor trigger the on-sale bar even if not sold to the public at large. *Id.* BICO additionally contends that subsequent deliveries of the Kachele motors to BICO confirm that the motors were "on sale." *Id.* at 14. Schlumberger argues that Kachele's Even Wall product was not subject to a "commercial offer for sale" before the critical date because there is no evidence that BICO (the U.S. distributor) commercialized any of the products. Dkt. 57.

As noted above when discussing the "on-sale" provision, the reasoning in the *Medicines* cases relates to the sale of the patentee's product, not a third-party product of the same design. For the public use provision, the court must determine whether the Kachele product was accessible to the public or commercially exploited. The evidence of sales to BICO without subsequent sales to other parties, under the facts of this case, is not clear and convincing evidence that the product was accessible to the public or commercially exploited.

### b. Confidential Sales

BICO concedes that under the agreement it was required to maintain certain technical and business information as confidential, but it contends that this confidentiality did not affect the ability of the sales between Kachele and BICO to invalidate the patent because even private and confidential

sales are invalidating under *Medicines II*. Schlumberger argues that secret or confidential uses by third parties do not invalidate later filed patents under the public use provision, which is the applicable provision when considering third-party sales. Dkt. 57 at 3–4, 8. BICO replies that even a commercial sale to a third party who must keep the invention confidential places the invention "on sale" under § 102 under *Medicines II* and *Helsinn*. Dkt. 59. Additionally, BICO argues that the inventors of the '921 Patent testified that they knew BICO was Kachele's distributor prior to filing the '921 Patent, which contradicts any claim that the relationship was confidential. *Id.*

Article 4 of the Cooperation Agreement states that the parties will not "disclose any technical and business information which the other party considers worthy of protection and explicitly communicates as such to the other Party to the Agreement." Dkt. 53, Ex. 12, art. 4. This does not state that the entire relationship was confidential, and there is no evidence that Kachele or BICO expressly communicated that any aspect of the relationship should be confidential. Moreover, there is contrary evidence because the inventors of the '921 Patent knew that BICO was a distributor for Kachele's power sections, *see* Dkt. 59, Ex. 51 ¶ 4.[3]

The court is not persuaded that the confidential nature of the relationship precludes application of the public use provision.

### c. Manufacturing Services

Schlumberger contends that many of the invoices confirm that the agreement was for manufacturing services, like in *Medicines*, and thus argues that the sales did not trigger the on-sale bar under *Medicines*. Dkt. 57. BICO asserts that this case is distinguishable from the manufacturing

---

[3] The inventor states that he was aware prior to filing for the '921 Patent that Kachele "had developed a power section for mud motors called the 'Even Wall,' which used a rubber liner of uniform thickness" and that he knew that BICO was Kachele's sole distributor for the power sections in the United States at that time. Dkt. 59, Ex. 51 ¶ 4 (Plop. Aff.).

contract in *Medicines* because title to the product changed hands here. Dkt. 59. Kachele owned the products and sold them to BICO as an exclusive distributor, and the invoices confirm the stators and rotors were sold. *Id.*

The court agrees with BICO that the invoices provide evidence that title transferred, which distinguishes this case from *Medicines*. *See, e.g.*, Dkt. 53, Exs. 16–17 (invoices for stators). However, since the court is considering public use as opposed to the on-sale bar, the significance of this factor is different. The title transfer provides some evidence of commercial exploitation, but it is not clear and convincing evidence of public use sufficient to grant summary judgment in BICO's favor.

### d.    Experimental Use

BICO argues that since the agreement was for global distribution, it was primarily for commercial rather than experimental purposes. Dkt. 53. It asserts that an agreement does not need a finished product to constitute a commercial offer and that here the commercial offer became binding with the price lists for Even Wall rotors and stators in July 1999. *Id.* (citing Dkt. 53, Ex. A &, Ex. A, Ex. 18 ¶ 21). Schlumberger argues that the invoices are for test/sample stators, pointing out that the invoices are for parts labeled "T-Nr" or "Sample Parts." Dkt. 57 at 8–9 (citing Dkt. 57, Exs. 57, 80, 85 at 46–47, 71–72).

The contract indicates that BICO will order part of its own demand as well as take over global distribution "[f]ollowing completion of successful test runs in the drilling field." Dkt. 53, Ex. 12, art. 2. While BICO provides some invoices, these invoices, taken together with the terms of the contract, are not clear and convincing evidence of public use rather than experimentation sufficient to support summary judgment.

22

### e. Invoiced Sales and the '921 Patent

Schlumberger takes issue with certain aspects of the invoices, pointing out that some of the invoices are for double tubes and that it is not always clear that the invoices are for products that meet the claims of the '921 Patent. Dkt. 57. The court need not address these arguments because it finds that BICO has not presented clear and convincing evidence of public use sufficient to grant summary judgment even if all of the invoices are for products that practice the patent.

### 2. Does the Display at OTC Constitute Public Use?

BICO argues that the trade show displays by Kachele invalidate the '921 Patent under the public use provision. Dkt. 53. It asserts that Kachele put its invention into public use with its display of Even Wall motors at the OTC in 1999 and 2000. *Id.* BICO also asserts that Kachele ran advertisements in advance of the OTC inviting people to learn more about Even Wall stators and rotors for mud motors, and it displayed a physical sample and drawings during the trade shows that had a shaped metal tube with five inwardly protruding lobes and a rubber liner that was thicker at the lobes. *Id.* Representatives showed the technology to numerous individuals including one of the inventors of the '921 Patent. *Id.* (citing Dkt. 53, Ex. A ¶¶ 40–42, Exs. 41–42). It again publicly displayed the models and drawings at OTC in 2000, which it contends generated interest in the technology, including interest from Schlumberger. *Id.* (citing Dkt. 53, Ex. A ¶¶ 45, 48, Exs. 45, 48).

Schlumberger argues that Kachele displayed an incomplete, inoperable, not-for-commercial-use rendering of a partial stator labeled "dummy" and stator and rotor drawings at OTC. Dkt. 57 at 17. It argues that BICO has failed to present clear and convincing evidence that the "dummy" or drawings were shown to any specific person or company and that, regardless, the "dummy" was not used. *Id.* It asserts that a mere display without use is not "public use" under § 102(b). *Id.* at 18 (citing *Motionless Keyboard Co. v. Microsoft Corp.*, 486 F.3d 1376, 1385 (Fed. Cir. 2007)).

Additionally, it points out that B. Kachele testified that the single tube stators from the 1999 drawings were never commercialized. *Id.* (citing Dkt. 57, Ex. 85 at 137:22–25, 109:13–21). Sclumberger also asserts that there is at least a question of material fact as to whether the "dummy" stator was even displayed because B. Kachele testified that Kachele would not have displayed pieces or products that it could not deliver. *Id.* (citing Dkt. 57, Ex. 85 at 116–17). Schlumberger notes that the only stator B. Kachele could identify as being shipped to OTC in 1999 is a conventional mud motor, not a stator having an external tube with a helically shaped inner surface. *Id.* at 19. Schlumberger also argues that uncorroborated oral testimony of an interested person—B. Kachele—recalling events from long ago is not clear and convincing evidence to invalidate a patent. *Id.* (citing *Neutrino Dev. Corp. v. Sonosite Inc.*, 337 F. Supp. 2d 942, 947 (S.D. Tex. 2004)). Schlumberger asserts that Kachele did not even have the stator or rotor to sell in 1999 or 2000, as it manufactured its first stator for BICO on July 27, 2000, and did not manufacture a rotor before 2002. *Id.* (citing Dkt. 59, Exs. 30–31 & Ex. A ¶ 30). It contends that mere preparations for sale prior to the critical date do not trigger § 102(b). *Id.* (citing *Medicines*, 827 F.3d at 1377–78). As evidence of "mere preparation," Schlumberger points to evidence that Kachele informed an interested customer that it could not supply Even Wall stators and rotors after OTC in 1999 because it did not have a construction facility. *Id.* (citing Ex. 73 at 1251, 1255 (requesting to test the new design with the customer and estimating that it would be ready for testing in about two months (Sept. 2, 1999)) and citing *Medicines*, 275 F.3d at 1050 (if an inventor tells a buyer it cannot have the invention yet, regardless on customer's interest, it is not "on sale")).

BICO relies on *Adenta GMBH v. Orthoarm, Inc.*, 501 F.3d 1364, 1371 (Fed. Cir. 2007), and *Beachcombers v. WildWood Creative Products, Inc.*, 31 F.3d 1154, 1160 (Fed. Cir. 1994), for its argument that a public display prior to the critical date is sufficient to place an invention in "public

use." Dkt. 53 at 16.  In *Adenta*, the patent at issue was an orthodontic bracket.  501 F.3d at 1366.

Adenta argued that the patent was invalid because an embodiment of the patented bracket was shown

at a trade show before the critical date.  At the trial court level, a jury found that the embodiment of

the patented bracket was publicly used or on sale at the trade show.  *Id.* at 1371.  On appeal, the

Federal Circuit noted that there was no challenge relating to whether the bracket at the trade show

contained all the limitations of the patented bracket, and there was no challenge to whether showing

the bracket at the trade show constituted public use or sale.  *Id.*  Instead, the challenge was to the

finding that there was clear and convincing evidence that the bracket was in fact displayed at the

trade show.  *Id.*  The appellant argued that all of the witnesses were interested witnesses who would

benefit from invalidation.  *Id.*  After noting that "a patent cannot be invalidated based on one

person's testimony alone without corroborating evidence, particularly documentary evidence," the

Federal Circuit found that this was not such a case because there was sufficient testimony and

documentary evidence to provide "a coherent and convincing story."  *Id.*

While the court finds *Adenta* helpful because it is a case involving a public display of an

alleged embodiment of the patented invention rather than a use or display by the inventor or a person

associated with the inventor, its usefulness with regard to the facts of this case is limited.  In *Adenta*,

the appellant did not contest that showing the bracket at a trade show constituted "public use," which

is the main contested issue with regard to the OTC display or displays here.

In *Beachcombers*, the invention was a liquid kaleidoscope, and Beachcombers, the patent

holder, appealed a jury finding that certain claims in the patent were invalid due to public use prior

to the critical date.  31 F.3d at 1156.  The jury found, specifically, that the designer of a device

known as the ODYLIC displayed the device to guests at a party prior to the critical date.  *Id.* at 1159.

The designer testified that she showed the device to about twenty to thirty guests to get their

feedback and did not attempt to conceal the device or keep it secret. *Id.* at 1160. One of the guests testified that she saw the device at the party and that a lot of other guests saw it and were picking it up and that the designer never requested the guests maintain secrecy. *Id.* The date of the party as stated in testimony corresponded with an entry in the designer's date book. *Id.* The party opposing a finding of public use argued that the evidence was not substantial enough and insufficiently corroborated by physical evidence. *Id.* The Federal Circuit disagreed, finding that the jury could have concluded from the evidence that the date of the party was prior to the critical date and that the inventor did not retain control over the use of the device or future dissemination of information about it. *Id.* The court thus found that the evidence was sufficient to support the jury's determination that the device was in public use prior to the critical date. *Id. Beachcombers* is instructive but distinguishable because the guests at the party were able to use the kaleidoscope not merely shown drawings or a portion of the invention.

Schlumberger relies on *Motionless Keyboard Co. v. Microsoft Corp.* to argue that a display at the OTC without actual use is not "public use." Dkt. 57. In *Motionless Keyboard*, the Federal Circuit considered an appeal of a district court's ruling that two patents were invalid under the public use provision of 35 U.S.C. § 102(b). 486 F.3d at 1378. One of the patents was for an ergonomic keyboard and the other for an ergonomic keyboard for a hand-held device. *Id.* The inventor disclosed the keyboard to a business partner, potential investors, a friend, and a person who conducted typing tests before the critical date. *Id.* at 1379. The potential investors signed non-disclosure agreements, some of which expired before the critical date, and the typist signed a non-disclosure agreement; the friend and the business partner did not sign agreements. *Id.* The inventor eventually assigned the patents to a company, Motionless Keyboard Company, and Motionless Keyboard Company sued Microsoft Corp. and others for infringement of various claims of the patent

with certain joysticks and cell phones models. *Id.* The defendants moved for summary judgment of invalidity based on public use. *Id.* The trial court invalidated the patents based on public use, finding that the disclosure to potential investors to obtain capital was a public use because the inventor's business partner was not under an obligation to keep the invention secret. *Id.* at 1379, 1384.

The Federal Circuit noted that in all of the cases in which the inventor disclosed his invention, except for the disclosure to the typist, the keyboard was not connected to a computer or other device. *Id.* at 1385. When the typist used it, she signed a non-disclosure agreement and did not use the keyboard again. *Id.* The Federal Circuit found that "the one time typing test coupled with a signed NDA and no record of continued use . . . did not elevate to the level of public use." *Id.* The other disclosures "only provided a visual view of the new keyboard design without any disclosure of . . . . the keyboard design without putting it into use." *Id.*

Based on these cases, the court finds that BICO has not presented clear and convincing evidence that Kachele's activities at OTC in 1999 and 2000 constitute public use. The evidence presented shows that, at most, a portion of the tube and drawings were displayed. This is different than the kaleidoscope that was usable in *Beachcombers*, and it is similar to the keyboard that was not attached to a computer in *Motionless Keyboard*.

### 3.     Was the "Invention" Ready for Patenting?

The court need not address the ready for patenting prong becuse it has found that BICO has not shown by clear and convincing evidence that Kachele's motors were in public use prior to the critical date.

## IV. Conclusion

Bico's motion for summary judgment (Dkt. 53) is DENIED.

Signed at Houston, Texas on June 12, 2019

_____
Gray H. Miller
Senior United States District Judge